Morning is 22 30075 Spell v. Edwards. Mr. Moore. We're excited to be here to you know, I'm from Alabama. And next week, I know what's going to happen. Unfortunately for us. My wife's a big Texas A&M fan. I'm very thankful for the opportunity to be here before you and to speak about this case, which has imminent infinite importance not only my client, but our country as well. Together with my co counsel, Mr. Jeffrey Wittenbrink. We're privileged to represent Pastor Tony Spell, the pastor of the light tabernacle church. He is truly a man of courage and conviction for his faith. He's been arrested. He's been charged with numerous violations of orders of the governor of Louisiana charged with a felony, threatened with contempt on numerous occasions, even confined to his home with ankle bracelets. And yet he spoke at his church with those ankle bracelets going off all the time. He'd been mocked, ridiculed, embarrassed, simply because he stood for his duty to preach the gospel. We contend that the defendants in this case have not only exceeded their discretionary authority, but it violated clearly established constitutional rights, both of the United States Constitution, as well as the laws and the Constitution of the state of Louisiana. And we're not alone in this belief. On October 23, 2020, just five months after we filed our this case, the Louisiana House of Representatives tried to stop the governor of Louisiana from his abuse of power. I will turn to the section in Louisiana Homeland Security. Just a second, Mr. Boyd. The mics are too hot. And so it's making this ringing sound. So I'm sorry. I apologize, sir. Can I ask a quick question, since I did interrupt you already now? Do you have cases under the statute in Louisiana? Do you have claims under the Louisiana statute? Or are you only bringing straight up constitution claims? We're bringing both the United States Constitution, and the state of Louisiana's basically mimic those rights. It goes toward under the Louisiana statute in Louisiana statute. Okay, thank you. Louisiana Homeland Security and Emergency Assistance and Disaster Act. 29 by statute 29 724. No, I'm asking about the Louisiana emergency statute. Yes, ma'am. It says basically, in section 736, nothing in this chapter shall be interpreted to diminish the rights guaranteed all persons on the Declaration of Rights and Bill of Rights, the United States Constitution, and then there's a separate statute for religious liberty. I had a question about your constitutional claims. If I'm wrong, tell me in reading your brief, it seemed to me you're taking a fairly categorical approach that there's no restriction on the ability to congregate in worship that's permissible. And you're not saying if we dial back the order saying every six feet or as many as your people can, your church can accommodate, as long as you can socially distance, you're saying there's no medium in there. It's all they cannot regulate at all. It's the wall of separation between church and state, and February 10 1947. And I'll get to that. The Supreme Court's decisions, the three that you cite multiple times seem to recognize there is some leeway for a state to regulate in a pandemic. Do you agree with that or not? Not on not on sides of church. No, ma'am. No, Mr. Moore, we just came up at your last argument that you made this this more absolute argument, but your co counsel made the argument that you were also making the leukemia argument, that you can't be treated less well than than other entities, that the idea that if you have the shopping mall and the airport and other protests, and everybody else can get together, you can't treat faith less. And that in your co counsel reiterated that they you were indeed making that argument, which was in your complaint. Are you you are making that argument today still making that argument today? Yes, ma'am. Okay, where did you brief that argument? You laid out the factual allegations, certainly, in the first part, but I didn't see any cases that said, even if the state can regulate to some extent, this violated our Constitution, because that you put in evidence of what would have been a under the Supreme Court decisions, what would have been constitutionally sound? Yes, ma'am. We went back to Everson versus Board of Education. That case is very special to me. It came out on February 10 1947. And back then, the media wasn't as certain as it is today. I was born the next day on February 11. On February 10 1947. It was the first case of the establishment clause in the history of our country, according to Justice Wiley Rutledge. And in that case, you go black from Alabama, said in the words of Jefferson, the clause against establishment religion was intended to wreck a wall of separation between church and state. He went on to say that wall must be kept high and impregnable. We could not prove the slightest breach. Now what's odd about that case is Justice Wiley Rutledge, who wrote the dissent, was even stronger than he was. He said, this forces us to determine for squarely for the first time, what was an establishment of religion in the First Amendment conception. And he said this, he said, that Madison, who wrote the Memorial Remonstrance, which was attached to that opinion, Everson versus Board of Education said, was certain his own mind that under the Constitution, there is not a shadow of right in general government to intermeddle with religion, and that this subject is for the honor of America perfectly free and unshackled, the government has no jurisdiction. What I'm trying to say is, when the governor of Louisiana did this, he knew, and everybody knew he has a staff of attorneys much bigger than our staff, that there is a jurisdictional limit on intrusion by the state into the church. And even the state of Louisiana, which tried to restrict his powers, they tried to end his emergency powers. And they, under the statute said, the legislature by petition signed by majority of the surviving members of either house may terminate a state of disaster, may establish a period during which no other declaration of emergency may be issued. And thereupon, the governor shall issue the executive order or proclamation in the state of disaster emergency. Instead of doing that, Governor Edwards sued the legislature, his own state, the ones that gave him this power, and said that they had violated the Constitution. In less than three weeks, the Federal District Court of Louisiana dismissed our case. On June 10, however, some seven months later, both houses of the Louisiana legislature issued a United States Supreme Court case of Roman Catholic Diocese of Brooklyn versus Cuomo. In our appellate brief, we brought out one of the legislators who had served from 1973, I believe it was, to 2000, who wrote the Declaration of Rights and wrote the limitations on the governor's powers. And he said that was their position across the board. On July 6, this remanded this case to the district court. Approximately six months later, the district court again dismissed with prejudice our case. Finally, on May 13... If we disagree with you that it's just not like a cut-through argument, that the state had some authority to regulate, did you ask for an opportunity to amend your petition to allege the facts that would say this regulation went too far, if it hadn't been that, it would have been constitutional? No, ma'am. I don't believe that was the reason for amending the complaint. We've never backed off the strict argument that separation of church and state means there's no jurisdictional position that the state can take to where they can restrict church assembly. In 1929, I believe it was, 1849, I'm sorry, they had a cholera epidemic in this country. President was Zachary Taylor. Zachary Taylor urged people to come from their secular work and gather in churches to pray to God. Their belief, their faith was so much stronger then that they had no problem. They didn't restrict churches then and had high death rates. But Mr. Moore, perhaps I misunderstood your briefs, but I thought your briefs argued that other entities were allowed to remain open like the, and there were these, you focused specifically, I think, on the, and I'm not here to say whether it's right or wrong, but on the BLM protest, was what I thought was a focus of the brief to say that these rules were only against religious entities and not against other gatherings. I felt that was throughout the brief. So is that not correct? We argued throughout the brief that that's what happened. Yes. And that that's what makes it wrong under leukemia. That's what makes it wrong under Everson. Well, I asked you this before, and I'm going to ask you this again. If you can win under leukemia, and you can't win under Everson, are you going to pass on a win? And I'm not sure what is your, you are the master of your case here today, sir. If, if, if the case law is not such that there is this impregnable barrier between church and state such that there can be no regulation among all kinds of entities, but there is a, but the law is instead that you can't treat religious entities different than other entities. If that is the law in Are you saying that you don't wish to have, that you don't wish to argue that theory, even if you could prevail on it? Because I thought last time you said you did wish to, your counsel said you did. And so I, but today I'm very confused. Well, don't be confused, madam. I appreciate the question. We can't win on any other argument. It's a loss, because it violates the United States Constitution, the first Establishment Clause case in their history. It's never been backed off of, they've never had anyone even presented to the case. In fact, Justice Thomas said our Establishment Clause jurisprudence is in shambles. He said, it's, it's confusing. It's, and he said that in Utah versus American Atheist case in 2011. Our case stands for the the first Supreme Court to address this problem said, it says, no, and I'll like to read that very quickly, if I could. Said, this is Justice Hugo Black. And he said, the establishment of religion of the First Amendment means at least this, neither state or federal government can set up a church, neither can force nor influence a person to go to or remain from away from church against his will. No person can be punished for entertaining or professing religious beliefs or disbeliefs for church attendance, or non attendance. That's pretty direct. In this case, we submit that if we argue any other position, I've pointed out in our briefs, yes, that they have treated us differently. But the basis of our argument is that there have no, there is no jurisdiction to limit a church attendance, not under. In fact, I think Justice Leto or one of the justices said that we can't disregard the Constitution in times of crisis. In fact, in times of crisis, we should go to the Constitution. As I was pointing out, the Louisiana Supreme Court basically said this, in their opinion, which they held in court. As judges, we have no more solemn duty than to protect the fundamental rights reserved by the church from government overreach. The probations in the executive orders that issue violate defendants fundamental right to exercise religion. They do not survive strict scrutiny based on limited evidence. The limits on gathering in Executive Order 30. And the limits on gatherings at the stay at home mandate in Executive Order 33 are unconstitutional as applied to the defendant. Mr. Moore, are you only seeking damages here today? Or are you are you relitigating the injunct permanent injunction issue? No, ma'am, we're not relitigating the we're not. Are you trying to get a permanent injunction today? You're only trying to get injunct damages. We're recognizing that if this was the conclusion of the case, we would seek a permanent injunction. Yes, ma'am. We're not asking for damages. At this time, we asked him for any complaint. This is merely trying to overcome motion dismissed by the federal district judge. We have no chance to even question the governor or question anybody. So what is left? What is it that you seek from us here today? I seek a ruling, overturning the motion dismiss and this court. So you are you seeking damages or not? Yes, ma'am. Okay, as we're making sure you're seeking injunctive relief, permanent injunction, we will seek permanent injunctive relief at the end of the case. We're not thinking temporary injunctive relief. It's already been litigated. The Supreme Court of Louisiana is quite clear. And I'm simply saying, it seems like you've saved time for rebuttal. Your time is expired. Oh, thank you. Yes, ma'am. Thank you. Good morning, Your Honors. May it please the court. Joshua Forse on behalf of Apolli, Governor John Bel Edwards. Louisiana has entrusted its governor with leading the state's efforts to respond to a public health emergency and protecting its citizens in the face of a global pandemic such as COVID-19. And that's exactly what Governor Edwards has done since the  health state of emergency in Louisiana, because of COVID-19, and then issued a series of proclamations based upon state and national public health guidance to stem the spread of the disease in Louisiana. The very last of the challenge proclamations that is at issue in this appeal, expired on June 5, 2020. Less than four months after the governor declared his public health state of emergency, and it coincided with Louisiana moving from phase one of reopening into phase two of reopening. Mr. Moore mentioned efforts by the Louisiana House of Representatives to end the governor's state of emergency. Those efforts are irrelevant to the appeal today. The Louisiana House of Representatives issued its petition in October 2020, about five months or four months after the last of the proclamations that is before this court expired. And as the district court in Louisiana declared that effort unconstitutional, and ultimately on appeal, the ruling was vacated as moot because the petition had expired. So that is not an issue before the court today. As the panel recognized, originally there were two claims brought against the governor, one for injunctive relief, and one for damages. I'm not entirely sure whether the appellants are still seeking injunctive relief or not, but that issue's been waived in this appeal. Nowhere in the briefing that's been presented to this court have the appellants argued that the district court erred in dismissing with prejudice the claim for injunctive relief. It's not one of the two issues that was presented to this court, and it was not included in the briefing. And as this court has held on numerous occasions, when a party doesn't brief issues on the appeal, they are waived. So do you see that the only thing that remains at this point is our claims for damages? Correct. That's right. Judge Jackson assumed a constitutional violation under the standards set forth in RCD and South Bay 2 in Tandon. But those cases merely apply the rule that public health regulations cannot treat religious activity more harshly than secular activity. Hasn't that rule actually been clearly established since Leukemia Babelou? The rule that the state may limit constitutional rights, including the free exercise of religion, if the state satisfies the applicable constitutional standard, has been established in Smith and then later on in Leukemia. But that's not the claim that the appellants are making in this case. Well, if they say the BLM protesters could be not socially distanced, and I'm not actually talking about any, I'm just reading what's directly in the brief. If they say BLM can do it, but church can't, that seems to me to be directly a leukemia, the kind of place that we have under Texas law that says if you can gut a deer on your driveway, then you can't say that the religious people can't have the chickens sacrificed. You know, that sort of thing. We have that case law in this circuit. So it's the same idea that you can't treat religious people differently than other secular purposes. And Your Honor, if I may make two points, one briefly and one more specifically to the argument that you've referenced. First, the district court decided that even if the appellants had stated a constitutional claim, which Judge Jackson assumed for the purposes of his ruling, that the governor was entitled to qualified immunity, and that there was no clearly established right at the time the governor issued his proclamations for an entire congregation to meet in person in a church building, especially during a pandemic. And as you heard in counsel's argument, that's the right that they're seeking to protect in this case. But assuming they are indeed, as they said at the last argument, and we have the transcript in the last, we all have that, that they are trying to make the leukemia argument, can you respond to it? Right. It wouldn't matter for qualified immunity, but even... Would it? Because if it was clearly established as a leukemia, then why wouldn't it be clearly established? The timing, the... We're dealing with when did we know that you can't treat religious different in this context. So let me address the factual point that you made with respect to the Black Lives Matters protest. The argument has never been that the governor's proclamations didn't extend to those protests. That's not the argument that the appellants have made. Excuse me. It's not the point that Judge Ho made in his dissenting opinion in the first appeal in this case. The argument was that the governor didn't apply these standards the same way to the protesters as he applied it to the churches. I think that that argument is a straw man argument. It doesn't address the qualified immunity issue at all, and it doesn't establish the constitutionality of the rules with respect to the churches at the time. First of all, the protests were outside. They were not inside, and that's what this case is about. This case is about whether or not the governor could legally limit gatherings inside of large groups of people. What about shopping malls, which were also allowed to remain open? Well, again, at the time that the governor issued the proclamations, the governing precedent allowed for him to make that distinction. And what case is that? I'm confused by what you're... Yes. So the... Yeah, Your Honor, we included in our brief a timeline of the proclamations and also the relevant case law, and I've provided to the court and also to opposing counsel just a bigger version of that, so it's a little bit easier to read. The precedent that allowed for restrictions on gatherings, including religious gatherings, if those gatherings could cause public harm, goes back to 1905 in the Jacobson case. And then in 1944 in Prince, the Supreme Court reiterated that at the time of a public health emergency, that the state may limit constitutional rights. So that... So why would... If it's about public health, then why would airports and shopping malls be treated differently than under the plain language of the EO? Because they involve different kinds of gatherings. Shopping malls are more important than... It's not... I mean, are... It causes less of a public health crisis to be shopping... Yes. Than it does to be praying? It's not a question of whether you're asking how much something costs or praying. The question is whether or not you're in a large inside gathering in close proximity, where the whole purpose of being in that area is to speak, sing, listen to somebody else speaking. What about the food court at the mall? Excuse me? Isn't the food court at the mall at least as dangerous as the worship center? I mean, assuming your mall has a food court. Certainly, the appellants have not put on any evidence in the record to prove that that is less dangerous. And the public health authorities on whom the governor relied, both at the state level and the national level. So let's pause for a second on that. So obviously, we're at a motion to dismiss stage, so they haven't put on any evidence at all. That's clearly not relevant. You would agree, though, I would think that it's not their burden, it's your burden, given the strict scrutiny associated with discrimination against a religious institution, to come forward with a motion for treating a church differently than a food court. Based upon the judge's ruling in dismissing the claims at this point, the burden's on the appellants to prove that there was some clearly established right at the time that the governor issued his proclamations. If we're looking at satisfying the constitutional standard of scrutiny, then for that, the burden would be on the governor. And they've come forward with 70 years of  scrutiny, they've come forward with a motion to treat a church differently. Mr. Moore says you're not allowed to regulate the church at all. But even if whatever the truth, whether we apply Everson or Lakoumi or RCD or Tandon or any of these cases, they all say, I think, unless you can point me to one that says something different, if you are going to treat a church differently than a food court, you have to have a compelling justification for doing it. Well, again, that directly refutes the argument that appellants are making, because appellants' argument is not that these standards were too strict or that these standards treated churches differently. Their argument is you can't regulate them at all. So it's one of two things, either you can't regulate them at all, or if you can regulate them, you have to have a compelling justification. But either way, I don't see what the justification you're offering would be for treating a church differently than a food court. The cases that you've mentioned, starting from Jacobson going all the way to Tandon, allow states to regulate churches and others during a time of a public health crisis, which I think the Supreme Court has recognized existed or exists during COVID, and that the kinds of proclamations the governor issued are intended to promote that compelling state interest. Over that time, from 1905 to 2021, the standard of scrutiny has changed. And there have been prior determinations in this case that the governor's actions were reasonable, and therefore satisfied the then existing constitutional standard. Let me ask you a question. Go ahead, I'm sorry. This court itself, in Abbott, in April 2020, right in the midst of the challenged proclamations, made it very clear that the governing standard was a state could regulate all constitutional rights in the time of a public health emergency. But the court is kind of, I mean, I was on that panel. I understand you're on it. Mia Culpa, perhaps. The court has walked us back on that. The Supreme Court has said, maybe we were a little bit too reliant on Jacobson. You know, we do our best to try to make decisions. But hasn't the court said, no, Fifth Circuit, you were a little bit too reliant on Jacobson, perhaps. I don't know if the Supreme Court has... Not directly, but in its other statements. Exactly. I don't know if the court has addressed this court directly, but I don't disagree with you that the standard of constitutional scrutiny has changed, not just since 1905, but since 2020. But wasn't it reminding us that maybe Fifth Circuit, you got a little too out on the Jacobson and really we're still in the protect... that what really is our protection of religious... they're telling us in the RCD and all that we're a little too out over our skis and we needed to go back to what the Supreme Court had already said. But it's not clear to me that that's the issue before this court. What Judge Jackson held, and I think that this is the proper standard, was that in judging the governor and his actions, we don't look at that in 2021 or 2022. We look at what the law was at the time he issued the proclamations. And the last of these proclamations ended on June 5th, 2020. And at that time, the Supreme Court had not decided Roman Catholic, had not decided South Bay II, had not decided tandem. Which is why my questions originally drew us back to leukemia, because that's the relevant standard. And it was pre-existing 2020 and 2021, but not so far back. So we got the, it's not Everson, it's not Jacobson, but isn't that the right time period? I don't think so, because leukemia recognized that if a state could satisfy the constitutional standard, that it could limit religious rights. And if that law were neutral and generally applicable, and only incidentally burdened religious rights, then it was constitutional. But this was not neutral and generally applicable because of the food court. Isn't that the problem with this on a motion to dismiss? I don't think so, because in South Bay I, which was issued, it was decided on May 29th, 2020, so about a week before the last of the proclamations expired. In his concurring opinion, Chief Justice Roberts set up a different frame of comparable activities. Under South Bay I, the food courts and grocery stores were not considered comparable to churches. But that's not binding, I mean, that was just his one-off. Respectfully to the Chief Justice, that was not, that's not part of the precedent, is it? That's just a concurrence. Well, it's part of it, that's correct. But again, from a qualified immunity standpoint, that was consistent with the prior law. That was consistent with Abbott, that was consistent with Prince, that was consistent with Jacobson. You had a continuous line of precedent running from 1905 through November 25th, 2020, when the Supreme Court decided Roman Catholic. That said that when states acted the way that Governor Edwards acted, they acted reasonably in responding to the pandemic. And as a result of that, Justice Jackson held, Judge Jackson, sorry, held that the governor had qualified immunity. And the appellants have not cited a single case that clearly established a right by June 5th, 2020, to be free from any regulation of church gatherings, or in particular to be free of these limitations on church gatherings. What evidence in the record did anybody put in on the difference between a church and a food court and a mall or other places in a mall? Your Honor, no. As Judge Oldham recognized, this was decided on a motion to dismiss. So there was no evidence introduced in the record. But there are allegations in the complaint. And then in the motion we put in articles that demonstrated that it was the consensus of public health officials at the time that indoor large public gatherings posed the greatest risk of spreading the disease. And that that applied more to a church or a movie theater or a lecture hall when people are sitting as they are today, shoulder to shoulder. We are much closer than we would be if we were in New Orleans. And we were speaking without masks. And it was that kind of gathering that the public health officials told Governor Edwards and governors all across this country posed the greatest risk. This is not necessarily an unfriendly question, but does the governor even have the authority to enforce the order such that he could be liable for qualified immunity anyway? And did you argue that one way or the other? It reminds me of the Texas litigation about who the person is who has the authority. We addressed that, I think it was in AVID 6. We argued that early on that the governor was not the enforcement official and therefore there was no claim against the governor. There since have been a lawsuit filed in state court that was removed to federal court. We've not made all the same 11th Amendment type arguments on appeal that we made in the district court at various stages. But we did make that argument early on. And there's no specific state law that has been cited to you either in the briefing or in any of the pleadings that establishes a cause of action under state law for damages against the governor in his individual capacity. And as we pointed out, he would be immune from that both under the federal doctrine of qualified immunity, under the state doctrine of state official immunity, as well as under the individual acts pursuant to which he acted, both of which provide for immunity from harm to person or property. Thank you, Mr. Forsher. Your time has expired. Thank you. Ms. Johnson. Good morning. Appellants have abandoned their claims against Sheriff Gautreaux. They have not specifically addressed his liability, his arguments in the motion to dismiss, the district court's reasons in its ruling. They generally focused, they applied it generally to appellees, but they focused specifically on the actions of the governor. The only mention of the sheriff in the brief is that he allegedly threatened to enforce the proclamations against Pastor Spell. Wouldn't he be the one who would actually do the enforcing because the governor's not running around enforcing these things? I mean, according to the allegations, it would be the governor or the chief in central Louisiana where the church is located. And there have been no allegations that the sheriff ever acted to enforce them. In fact, even after this alleged threat in March of 2020, which the sheriff denies, Pastor Spell continued holding numerous church services. This didn't stop him, and there was no allegation and no evidence that the sheriff ever did anything to enforce them. So the sheriff never took any action. This is not the person that was doing the arresting? No. The chief issued some misdemeanor summons to Pastor Spell. That's coming. That's coming. But no, the sheriff, and there's no allegation, and there's no evidence that the sheriff ever did anything to enforce them. So, as we've argued... But if he did threaten them, why wouldn't that be enough? He has authority. He's a sheriff. Well, as the district court said in its rulings, is there was never any real or imminent threat because he continued conducting these services. But even if it were a constitutional violation to threaten to enforce them, he's entitled to qualified immunity because the proclamations had the force and effect of law in March of 2020 at the time that the alleged threat was made. And he would have been reasonable to enforce. I guess I don't understand why it's not a real or imminent threat just because you continue with the conduct. Your decision to continue with the conduct could be in spite of the real or imminent threat, like, you know, Martin Luther King realized he's going to the Birmingham jail, you know. It doesn't mean that you don't really think they have the power. It means that I'm going to do this because of my conscience, no matter what. Well, I don't know what the case law is on that. That hasn't ever actually been briefed. But the sheriff never did anything beyond the alleged threat. And even if he did, he's entitled to qualified immunity. And that's what our argument has been the whole time in the motion to dismiss and hear before this court, and I understand that this court recognizes the importance of qualified immunity to these public officials. So even if that were a constitutional violation, he's still entitled to qualified immunity because he would be objectively reasonable in acting pursuant to valid law. There's never been any. Can I ask you a question about that? Okay. So imagine, I realize you dispute it, but just take my hypothetical for a second. Sure. Imagine that the executive order is actually unconstitutional. Why does it matter that the executive order has the force and effect of law? Doesn't the sheriff have an independent obligation to know the Constitution and its meaning and application to the governor's proclamations? Well, as set forth earlier by Mr. Force, in March of 2020, all indications were that the governor was acting and pursuant to his authority in valid law. There was never any indication that he did not have that authority. Which is why I'm asking you to assume this for me. Okay. Right? So I'm asking you to just don't fight the hypothetical. Just assume the executive order is unconstitutional. It wouldn't matter that the executive order was issued pursuant to Louisiana law because the sheriff would have an independent obligation to understand the context of the First Amendment. I'm sorry. I misunderstood the question. No, it's fine. But yes, and so anything he did after it was unconstitutional would be. But at the time, even the state court judge was enforcing the proclamation. So surely, if someone with a law degree who is sitting on the bench believes that they were not unconstitutional, or even if they were enforcing them, the sheriff was reasonable in potentially enforcing them, I should say. But, and again, this is all for qualified immunity. It's all the sheriff's actions were objectively reasonable at the time in March of 2020 at the beginning of a pandemic when public health was, you know, everybody's focus. And this court had looked at it and very soon thereafter in April of 2020 and determined that the governor had the authority to do that, to issue these proclamations. I believe my time is up. Thank you, your honor. Good morning, your honor. Scott Thomas here on behalf of Chief Roger Corcoran. I, too, have obviously argued in my brief that the claims against the chief are abandoned for all the reasons that Ms. Johnson has said. They did not address his liability, the arguments made in the motion to dismiss, or the allegations, the district court's rulings in the motion to dismiss. As to some of the things that you were saying, yes, we are the ones. We're the ones who issued the, went with the six misdemeanor summonses and passed them off. At the time that was done, there was no clearly established law that said that he shouldn't do it. In fact, police are charged to enforce laws until and unless they have been declared unconstitutional. That hadn't happened in this situation. I would argue that the fact that we're standing here today still tells you that we don't know what the real rule of law was in March, April, May of 2020 as to the enforcement of these proclamations. My chief, sitting in the city of Central, knows that Pastor Spell is conducting church services and they're in violation, as he reads it, of the orders of the governor. Counsel, I'm sorry to interrupt because I know your time is limited. Yes. But I just want to make sure I understand this. Do you agree that all three of the defendants, the qualified immunity claims, rise and fall together? That is, there either was clearly established law at the time of these proclamations as a constitutional matter and therefore everyone acted in violation of it, or that in fact there was no clearly established law and therefore everybody acted lawfully. But there's really no way to distinguish between your client, his client, and her client. I think that the distinctions are certainly a function of what they did rather than how they acted. I certainly understand what you're saying. But I guess what I'm asking is, as a matter of constitutional law, either the First Amendment precedent was clearly established for everybody or for nobody? I agree with that. Forgot my, well, I'm sorry. I'm sorry. That's okay. I'm sorry. That's okay. Mr. Wittenberg? Yes. Good morning, Your Honors. It's an honor to be here. Thank you very much. I'm glad to be here in front of these law students as well. I mentioned to some of them earlier that my first year of law school, I watched arguments before Louisiana Supreme Court at our law school. And I sat in the back and I said, I can do better than these guys. And so I hope that we are helping these students today by inspiring them. Judge Ullman, I agree with your point completely. The First Amendment and the law in the First Amendment controls this case or doesn't. And the Louisiana Supreme Court clearly believed, and we appended that to our brief. The Louisiana Supreme Court clearly believes that this was not a valid and neutral law and that the constitutional rights of Pastor Spell were violated. And I would suggest to your honors that while it may not be binding on the court, it's certainly very instructive. With regard to Judge Elrod, your point about leukemia, we're not giving up our argument that there's really not jurisdiction over assembly. But your honors must understand it's really difficult to get to court on a pure violation without having something else having happened. And so these other things having happened, we're bringing all this before the court. I'm not sure I understood that. Okay. So in other words, it would be almost impossible to bring a pure case of jurisdiction before the court. In other words, there has to be some kind of smaller infraction. And I think that the lesser is included in the greater. That there's got to be some kind of infraction before we get before any court. And so not to... But if you didn't brief it and point out the law that says, well, if the order had been more circumscribed or it applied equally to X, Y, and Z, it would have been valid, but it wasn't. I mean, I didn't see that in there. I mean, I saw the facts about the Black Lives Matter and all of that, but I didn't see any law that said, argument that, you know, if we're wrong about the total cut-through argument, we're right at least about this. Well, I would suggest to your honors that this has been up here before. We've presumed several arguments that have been before this court. But you can't presume things in your briefing. You've got to, this is this case and you've got to brief it. So is it in your brief? Well, I believe it's at least in the reply brief that we address some of those issues. Is it in your opening brief? I'm not certain that it's in the opening brief. It's certainly also brought up in the appended materials that we sent to the court after the Louisiana Supreme Court ruled as well. And of course, that was part of the basis of their ruling. At any rate, we believe that your honors are correct on that point. The, what case says that a food court is different from or the same as a church? So I believe that that was going to be in, the food court case would have been part of the arguments brought up by Justice Gorsuch. I think in one of his concurrences or in South Bay 2 or in Roman Catholic Diocese. I can tell your honor that I do agree with Judge Elrod about the leukemia case. And the fact that this should have been at least brought up that the discrimination, you know, it's not necessarily that churches are to be treated equally, but they can't be treated less. And that's the point. Justice Gorsuch said actually we have to consider enumerated rights more than other rights that have been developed through the jurisprudence. I think that's the point he was making about Abbott. Your honor, you brought that up. That he's, you know, he came out and said, listen, the enumerated rights in the Constitution have some weight and have some meaning and you can't throw them out because there's an emergency. And that's the main point. Now, I want to address qualified immunity real quickly. These executives, Sheriff Gautreau is an executive, and he's trained, they get post-training, which includes training on the Constitution. Both of these officers are executives, and they both get training on the Constitution. They both had to know and read the First Amendment. They get special training in Fourth, Fifth, and Sixth Amendment. They're not lawyers, but the meaning of the Constitution is pretty plain. Were there dissenters in any of these cases at the Supreme Court? I'm sorry? Were there dissenters in any of these cases? There were two dissenters at the Louisiana Supreme Court. At the U.S. Supreme Court. At the U.S. Supreme Court. So, yes. What did they say? Judge, I can't put together all the dissents right now. Okay, that's all right. I don't know, I only had five minutes. I could address more of their points, but thank you very much. Thank you.